UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

LARRY ALAN NASH,               )
                               )
            Plaintiff,         )
                               )
      v.                       )      No. 4:12CV1454 FRB
                               )
CAROLYN W. COLVIN, Acting      )
Commissioner of Social Security,)
                               )
            Defendant.         )


**<u>MEMORANDUM AND ORDER</u>**

This cause is before the Court on plaintiff's appeal of
an adverse decision by the Social Security Administration. All
matters are pending before the undersigned United States Magistrate
Judge, with consent of the parties, pursuant to 28 U.S.C. § 636(c).

**I. Procedural History**

On August 19, 2010, plaintiff Larry Alan Nash filed an
application for Disability Insurance Benefits pursuant to Title II
of the Social Security Act, 42 U.S.C. §§ 401, et seq., in which he
claimed he became disabled on November 24, 2008. On initial
consideration, the Social Security Administration denied
plaintiff's claim for benefits. (Tr. 57-58, 66-70.) At
plaintiff's request, a hearing was held on July 21, 2011, before an
Administrative Law Judge (ALJ) at which plaintiff and a vocational
expert testified. (Tr. 37-56.) On September 2, 2011, the ALJ
entered a decision denying plaintiff's claim for benefits, finding
plaintiff able to perform other work as it exists in significant

numbers in the national economy. (Tr. 16-32.) On June 25, 2012, after review of additional evidence, the Appeals Council denied plaintiff's request for review of the ALJ's decision. (Tr. 1-5.) The ALJ's decision is thus the final decision of the Commissioner. 42 U.S.C. § 405(g).

In the instant appeal for judicial review, plaintiff claims that the Commissioner's final decision is not supported by substantial evidence on the record as a whole. Specifically, plaintiff contends that the ALJ failed to consider plaintiff's impairments in combination. Plaintiff also claims that the ALJ erred in determining plaintiff's residual functional capacity (RFC) inasmuch as the ALJ did not consider all of the medical evidence of record and improperly discredited plaintiff's subjective complaints based on his daily activities. Finally, plaintiff contends that the ALJ failed to meet his burden at Step 5 of the sequential analysis to demonstrate that plaintiff can perform other work in the national economy. Plaintiff requests that the Commissioner's decision be reversed and that benefits be awarded, or that the matter be remanded to the Commissioner for further proceedings.

Upon consideration of plaintiff's claims and review of the entirety of the record, the undersigned finds there to be substantial evidence on the record as a whole to support the ALJ's decision. The Commissioner's decision should therefore be affirmed.

## II. Testimonial Evidence Before the ALJ

A.  Plaintiff's Testimony

At the hearing on July 21, 2011, plaintiff testified in response to questions posed by counsel and the ALJ.

At the time of the hearing, plaintiff was forty-seven years of age. Plaintiff stands five feet, eleven inches tall and weighs 324 pounds. Plaintiff is divorced and has no minor children. Plaintiff lives alone. Plaintiff graduated from high school and received no vocational or military training. (Tr. 40-41, 47.)

Plaintiff's Work History Report shows that plaintiff worked as a lineman with a telephone construction line crew from June 1993 to January 1994, and then as a foreman with a crew from 1994 to February 1998. From May 1998 to October 2005, plaintiff worked at Briggs & Stratton Corporation as a machine operator. From February 2007 to May 2007, plaintiff worked as a groundman with electrical power construction. From August 2007 to November 2008, plaintiff worked as an over-the-road truck driver. (Tr. 154.) Plaintiff testified that he left his job as a truck driver because of his health. Plaintiff further testified that he was fired from this job in January 2009 while he was on medical leave. Plaintiff testified that he received unemployment compensation through November 2010 and applied for other employment while he was receiving benefits, but that no one would hire him. (Tr. 41-42,

55.)

Plaintiff testified that he learned in 2007 that he had diabetes and that the condition currently causes neuropathy in his feet. Plaintiff testified that the neuropathy causes him to be unable to stand for more than ten to fifteen minutes at a time and that he cannot sit for long periods of time because his feet become numb. Plaintiff testified that he must get up to walk around every twenty or thirty minutes to get feeling back in his feet and legs. Plaintiff testified that he also gets dizzy spells on account of diabetes, and that the medication he takes for the condition causes drowsiness. Plaintiff testified that he can never drive a truck again because he must take insulin for his condition. (Tr. 42-44.)

Plaintiff testified that his obesity is worsening because of his diabetes and the continual adjustments to his medication. Plaintiff testified that he has tried dieting and walking, but that his neuropathy creates problems with exercise. (Tr. 44-45.)

Plaintiff testified that he has numbness and tingling in his hands on account of carpal tunnel syndrome he developed while doing factory work for ten years. Plaintiff testified that such condition remains undiagnosed. Plaintiff testified that he also experiences sharp pain in his arms which sometimes radiates to his chest and that he believes such pain is related to his diabetes. (Tr. 45-46.)

Plaintiff testified that he also has high blood pressure

for which he takes medication. Plaintiff testified that the medication causes dizzy spells and headaches. (Tr. 47-48.)

Plaintiff testified that he experiences popping and pain in his right foot as residual effects from a broken foot. (Tr. 48-49.)

Plaintiff testified that he also has severe sleep apnea and experiences many nights with no sleep. Plaintiff testified that he experiences daytime tiredness as well. Plaintiff testified that the tiredness caused by sleep apnea coupled with drowsiness caused by his medications causes him to doze during the day and take naps. (Tr. 49-50.)

Plaintiff testified that he suffers from depression but takes no medication for the condition. Plaintiff testified that his depression makes him stay in the house for long periods of time. (Tr. 48.)

As to his daily activities, plaintiff testified that he is able to do chores at home but that he takes many breaks while doing them because he cannot stand for very long. (Tr. 47.) Plaintiff testified that he drives but must take breaks every half an hour because his legs and feet become numb. (Tr. 50.)

B.   <u>Testimony of Vocational Expert</u>

Charles R. Poor, a vocational expert, testified at the hearing in response to questions posed by the ALJ and counsel.

Mr. Poor classified plaintiff's past relevant work as a

line installer/repairer as heavy and skilled; as a machine operator as medium and skilled; and as a truck driver as medium and semi-skilled. (Tr. 51.)

The ALJ asked Mr. Poor to assume a person of plaintiff's age, education and past work experience and to further assume that

> he has to alternate between the sitting and standing at will. Lift weights up to 20 pounds, 10 pounds frequently. No heights or climbing. No moving or dangerous equipment. No foot controls. He must work indoors in a clean air environment. And from the psychological side he can understand, remember and carry out, and ability to make judgments on simple work-related decisions is none -- ability there. Understand and remember complex, carry out complex and make judgment on complex, I would put as moderate. Interact appropriately with the public, none. Interact appropriately with supervisors, none. Interact appropriately with coworkers, none. And -- appropriate to usual work situations, to changes in a routine work setting I would just put mild.

(Tr. 51-52.)

Mr. Poor testified that such a person could not perform any of plaintiff's past relevant work but could perform other work in the national economy such as security guard, of which 8,000 such jobs exist in the regional area and 500,000 nationally; hand packager, of which 4,000 such jobs exist in the region and 255,000 nationally; and cashier, of which 38,000 such jobs exist in the region and 1.7 million nationally. (Tr. 52-53.) Mr. Poor testified that a person who had to lie down more than two hours

during a work day due to sleep apnea and medication side effects could not be a competitive worker in any job.  (Tr. 54.)

In response to questions posed by counsel, Mr. Poor testified that a person who could work only a four-hour day, or whose concentration and attention interfered frequently with the performance of a job, could not perform any of the jobs to which he previously testified.  (Tr. 54-55.)

### III.  Medical Evidence Before the ALJ

From 1989 to 1997, plaintiff received treatment from Associated Chiropractic Physicians for back pain and neck pain. (Tr. 190-96.)  During this period, plaintiff received treatment for chondromalacia and medial meniscal injury to his right knee.  (Tr. 439-42.)

In July 1999, plaintiff visited Rolla Family Clinic with complaints of a two-year history of low back pain.  Plaintiff was noted to be obese.  Physical examination showed tenderness along the left SI area, with normal range of motion.  Exercises were prescribed and plaintiff was advised to lose weight.  Trilisate and Vicodin were prescribed.  (Tr. 331.)

Plaintiff returned to Rolla Family Clinic on August 15, 2002, with reports of continued low back pain.  Plaintiff was referred to physical therapy, and Naprosyn was prescribed.  (Tr. 330.)  Plaintiff visited Sport Rehab on August 19, 2002, who noted plaintiff to be obese and to have excessive lumbar lordosis,

anterior tilted pelvis, and increased thoracic kyphesis. Therapy
sessions were scheduled to correct plaintiff's muscular imbalances.
Upon plaintiff's discharge from therapy on September 23, 2002, it
was noted that plaintiff had minimal pain with prolonged activity
and was more flexible. (Tr. 197-211).

On April 18, 2006, plaintiff visited Dr. Bonnie Ranney at
St. John's Clinic with complaints of pain in his right foot. It
was noted that plaintiff was continuing to gain weight. Dr. Ranney
opined that plaintiff may have some issues with depression.
Plaintiff was referred to podiatry, and Meridia was prescribed for
weight loss. An x-ray of the right foot taken that same date
showed plantar calcaneal spur. (Tr. 316, 317.)

Plaintiff visited St. John's Clinic on April 26, 2006,
with complaints of increasing pain in his right foot with walking
or standing, causing severe limits in his activities. Plaintiff
also reported severe arthritis in his hands. Plaintiff's history
of obesity was noted. (Tr. 218, 299.) Dr. Mark A. Schumaker noted
the significant amount of pain exhibited by plaintiff to appear out
of proportion with clinical examination. (Tr. 218-19.) An MRI of
the right foot taken April 27, 2006, showed stress fracture of the
fourth metatarsal and degenerative change of the second through
fifth tarsometatarsal joints. (Tr. 222-23, 303.) Plaintiff
continued to complain of pain in his right foot on May 1, 2006, and
made no other complaints. Dr. Schumaker recommended that plaintiff

stay off of his right foot, but plaintiff reported that he could not do so because of his work. Plaintiff was diagnosed with stress fracture of the fourth metatarsal and severe degenerative arthritis of the Lisfranc joint. (Tr. 217, 298.)

Plaintiff reported to Dr. Schumaker on June 7, 2006, that he could not continue with his current work because of the pain in his right foot. Dr. Schumaker noted there to be no difference in examination between plaintiff's right and left foot. An x-ray of the right foot showed no current or new fracture and was essentially normal. Dr. Schumaker determined to place plaintiff in a cast and instructed plaintiff to stay off of the foot. Plaintiff was provided crutches and was prescribed Demerol. (Tr. 216, 221.)

Plaintiff returned to Dr. Schumaker on June 14, 2006, and reported that he could not stay off of his feet and that his cast was broken, worn and falling apart. Plaintiff was provided a new CAM walker and was instructed to stay off of his right foot. Plaintiff was informed that pain medication would not be prescribed. (Tr. 215.)

On June 23, 2006, plaintiff was diagnosed with moderate obstructed sleep apnea after having participated in a sleep study. A repeat sleep study was recommended. (Tr. 245-46.)

On July 12, 2006, plaintiff reported to Dr. Schumaker that he was doing well. Dr. Schumaker determined to release plaintiff to return to work. Plaintiff inquired about disability.

Plaintiff was advised that he would have long term pain associated with this injury. (Tr. 214.)

Plaintiff returned to Dr. Schumaker on August 14, 2006, and complained of sharp, stabbing pain in his right foot causing difficulty at work and at home. An x-ray showed no obvious fracture or dislocation and was essentially normal. Plaintiff requested a CAM walker but Dr. Schumaker opined that such would not help plaintiff's condition. Plaintiff also requested an extended period off of work, but Dr. Schumaker stated that there was no physical reason other than pain to stay off of work. Plaintiff was referred to his company physician. (Tr. 213, 220.)

Plaintiff visited Dr. James A. Felts at St. John's Clinic on August 16, 2006, and expressed concern about returning to work with his foot condition inasmuch as his job required him to stand on his feet all day. Plaintiff was instructed to continue with Dr. Schumaker and to consider participating in vocational rehabilitation. (Tr. 314.)

Plaintiff visited Dr. Ranney on September 19, 2006, complaining of continued problems with his right foot. Plaintiff also reported having arthritis in his hands and joint pains in his knees. Laboratory tests were ordered and medication for high blood pressure was prescribed. (Tr. 313.)

Plaintiff was admitted to the emergency room at St. John's Mercy Medical Center on January 26, 2007, having been

advised during a routine check up that he had elevated blood sugar levels. Plaintiff was noted to be five feet, ten inches tall and to weigh 325 pounds. Plaintiff's past medical history was noted to include obesity, sleep apnea, high blood pressure, and high cholesterol. It was noted that plaintiff currently took Lisinopril. Plaintiff was diagnosed with new onset diabetes, and insulin was administered. Plaintiff was discharged that same date with instructions as to diet and diabetes. Plaintiff's discharge medications included Glucotrol and Glucophage. (Tr. 228-40.)

As a result of a sleep study conducted January 29, 2007, it was recommended that plaintiff undergo a trial use of a CPAP machine for moderate obstructed sleep apnea. It was also recommended that plaintiff lose weight. (Tr. 243-44.)

Plaintiff visited Dr. Kathryn D. Sievers at St. John's Clinic on April 13, 2007, and complained of pain in his legs and occasional numbness in his feet. It was noted that plaintiff was taking Vicodin for the pain. Plaintiff reported that he was taking his medication for his diabetes condition regularly and that his blood sugars were fairly well normalized. Dr. Sievers noted plaintiff to have lost some weight. Plaintiff was instructed to continue with his diabetes medications, and his prescription for Vicodin was refilled. Nerve conduction studies were ordered. (Tr. 310.) Blood tests from that same date showed plaintiff's diabetes to be controlled. (Tr. 353-55.)

On May 17, 2007, plaintiff reported that he no longer had excessive daytime sleepiness with use of the CPAP machine. (Tr. 256.)

Plaintiff visited Dr. Sievers on June 1, 2007, complaining of leg pain. Dr. Sievers noted a nerve conduction study to show sensory polyneuropathy bilaterally. Dr. Sievers opined that such condition was most likely related to diabetes. It was noted that plaintiff had recently been terminated from his job. Plaintiff was noted to be distraught in that he could not stand for long periods due to pain and therefore could not perform factory work. Plaintiff also reported that he could no longer engage in heavy lifting. Plaintiff reported that he was considering returning to school to train for another career or to apply for disability. Plaintiff was diagnosed with diabetes mellitus with bilateral lower extremity neuropathy. (Tr. 307, 308.)

Plaintiff visited Dr. Ranney on April 4, 2008, who noted plaintiff's leg pains to have improved. It was noted that plaintiff had gained weight during the past year. Plaintiff's medications were noted to include Glucophage, Glucotrol, Lisinopril, Gemfibrozil, and an alpha blocker. Plaintiff's medications were adjusted. (Tr. 376.)

Plaintiff visited St. John's Clinic on December 8, 2008, for follow up of a recent emergency room visit for pneumonia. It was noted that plaintiff became ill while on the road working as an

over-the-road truck driver.  Upon examination, plaintiff was diagnosed with dyspnea, chest pain, pneumonia, and diabetes mellitus without complication. (Tr. 366-67.)  Plaintiff returned for follow up on December 15, 2008, and complained of shortness of breath, fatigue, cough, and dizziness.  Plaintiff reported that he could not do anything except sit or lie down.  Plaintiff was upset that he could not work.  Plaintiff was given an injection of Ceftriaxone and was instructed to follow up in one week.  (Tr. 368-69.)  Plaintiff followed up on December 22, 2008, and reported that he felt better although he continued to experience some weakness and shortness of breath.  A note was given for work.  (Tr. 371.)

Plaintiff returned to St. John's Clinic on January 16, 2009, and reported that he was experiencing pain in his left heel. It was noted that plaintiff was compliant with his diabetes medication but not with his diet.  Plaintiff also reported that he was under stress in that he was going through a divorce and would likely have to file for bankruptcy.  Plaintiff's diabetes was noted to be poorly controlled due to intercurrent illness.  Diagnostic and laboratory testing was ordered.  (Tr. 372-73.)

On December 8, 2009, St. John's Clinic noted plaintiff's diabetes to be uncontrolled and that plaintiff was morbidly obese. (Tr. 395.)

On December 29, 2009, plaintiff reported to St. John's Clinic that he was unable to afford test strips to check his blood

sugar levels. It was noted that plaintiff's diabetes was now uncontrolled and required insulin. Plaintiff's medications were refilled. (Tr. 393.)

On January 5, 2010, improving control of plaintiff's diabetes was noted at St. John's Clinic. Plaintiff's medications were adjusted. (Tr. 392.)

Plaintiff visited St. John's Clinic on July 6, 2010, complaining of having a diabetic episode over the weekend. It was noted that plaintiff had been playing drums at a concert for over two hours outside in the heat and began experiencing dizziness and lightheadedness. Plaintiff also reported experiencing numbness and tingling in his feet and legs. Examination showed plaintiff to be obese and to have decreased sensation in the feet bilaterally. Plaintiff was diagnosed with diabetes mellitus, type II, with neuropathy; hyperlipidemia; and hypertension. Plaintiff's medications were refilled and plaintiff was instructed to follow up in three months. (Tr. 389.)

Laboratory testing conducted on July 8, 2010, showed plaintiff's diabetes to be under poor control. (Tr. 387-88.)

On August 12, 2010, plaintiff underwent a consultative physical examination for disability determinations. Plaintiff reported taking insulin for his diabetes and being unable to obtain employment as a driver on account thereof. It was noted that plaintiff moved around easily. Plaintiff was morbidly obese.

Plaintiff reported having diabetic peripheral neuropathy, having constant numbness in his feet and legs.  Plaintiff also reported having constant pain and burning in his feet.  Plaintiff reported having pain in his back that sometimes radiated down his legs. Plaintiff reported that chiropractic adjustment no longer provided relief.  Plaintiff reported that he could walk one half to one mile but with shortness of breath and sore feet.  Plaintiff reported that he could stand for fifteen minutes but had no trouble sitting. Plaintiff reported that he could carry about fifty pounds.  Dr. John Demorlis noted plaintiff's current medications to be Metformin, Glyazide, Lantus, Lisinopril, Lovastatin, and Terazosin. Physical examination was hindered due to plaintiff's obesity. Diminished sensation was noted about the toes.  Plaintiff could do a full squat and could walk on his heels and toes.  Motor strength, reflexes and gait were noted to be normal.  Range of motion was noted to be normal, except for limited straight leg raising and limited hip flexion due to obesity.  Dr. Demorlis diagnosed plaintiff with poorly controlled insulin-dependent diabetes, peripheral neuropathy, morbid obesity, hyperlipidemia, chronic back pain, hypertension, and sleep apnea with use of CPAP.  Dr. Demorlis concluded that plaintiff was not totally disabled but that his peripheral neuropathy would make driving precarious given the dubious sensations in his feet.  Dr. Demorlis recommended that plaintiff see an endocrinologist for his diabetes.  (Tr. 409-13,

414-15.)

On September 2, 2010, plaintiff underwent a psychological evaluation to assist in determining Medicaid eligibility. Plaintiff's primary complaint was that he had a lot of medical problems and no job with health insurance. Dr. Thomas Spencer noted plaintiff's diabetes, hypertension and high cholesterol to be poorly controlled. Plaintiff reported that he was sent to a psychologist because he told a caseworker that he was depressed and almost suicidal. Plaintiff reported that he could not find employment and could not get his health under control. Plaintiff reported being depressed for years but never obtaining treatment. Plaintiff reported feeling hopeless and helpless but that he did not have current or recent suicidal thoughts. Plaintiff reported having poor sleep and feeling fatigued during the day. Plaintiff reported that he lacked motivation and procrastinates. Plaintiff reported that he gets out of bed and maintains his activities of daily living but that he often starts things without finishing. Plaintiff reported having difficulty staying on task and focusing, and further reported being forgetful. Plaintiff reported having lost interest in most of what he enjoys. Plaintiff reported periodic anger and that he spends part of his day sitting around the house isolated from friends and family. Plaintiff reported that he lived alone and had no friends, but had regular contact with his mother and daughters. Plaintiff reported that he attended

church.  Plaintiff reported that he tried to get out of the house and exercise and that he enjoyed camping and outdoor activities. Mental status examination showed plaintiff to have a nervous mood and flat affect with circumstantial flow of thought and some difficulty staying on task.  Plaintiff's insight and judgment seemed fairly intact.  Upon conclusion of the evaluation, Dr. Spencer diagnosed plaintiff with adjustment disorder, depressed, chronic; polysubstance abuse in sustained remission; rule out major depressive disorder.  Dr. Spencer assigned a Global Assessment of Functioning (GAF) score of 50-55.[1]  Dr. Spencer opined that plaintiff had a mental illness, "one that appears to interfere with his present ability to engage in employment suitable for his age, training, experience, and/or education."  Dr. Spencer opined that plaintiff's prognosis would improve with appropriate treatment and compliance.  (Tr. 404-08.)

On October 12, 2010, Dr. Barbara Markway, a psychological consultant with disability determinations, completed a Psychiatric Review Technique Form in which she opined that plaintiff's chronic

_____

[1]A GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health/illness." Diagnostic and Statistical Manual of Mental Disorders, Text Revision 34 (4th ed. 2000).  A GAF score of 41-50 indicates serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational or school functioning (e.g., no friends, unable to keep a job).  A GAF score of 51 to 60 indicates moderate symptoms (e.g., flat affect and circumstantial speech, occasional panic attacks) or moderate difficulty in social, occupational or school functioning (e.g., few friends, conflicts with peers or co-workers).

adjustment disorder and polysubstance dependence in remission caused mild restrictions in activities of daily living and mild difficulties in maintaining social functioning; and moderate difficulties in maintaining concentration, persistence or pace; with no episodes of decompensation of an extended duration. (Tr. 424-35.) In a Mental RFC Assessment completed that same date, Dr. Markway opined that, in the domain of Understanding and Memory, plaintiff was moderately limited in his ability to understand and remember detailed instructions, but was not otherwise significantly limited. In the domain of Sustained Concentration and Persistence, Dr. Markway opined that plaintiff was moderately limited in his ability to carry out detailed instructions and to maintain attention and concentration for extended periods, but was not otherwise significantly limited. In the domain of Social Interaction, Dr. Markway opined that plaintiff was moderately limited in his ability to accept instruction and respond appropriately to criticism from supervisors, but was not otherwise significantly limited. Finally, in the domain of Adaptation, Dr. Markway opined that plaintiff was not significantly limited in any regard. (Tr. 436-38.)

Plaintiff visited Dr. Randall Huss on December 23, 2010, for follow up on diabetes. It was noted that plaintiff's medications included Glucophage, Gemfibrozil, insulin, Neurontin, Glucotrol, and Lisinopril. Plaintiff's medications were refilled

and referrals to ophthalmology and podiatry were made.  (Tr. 467-69.)

On January 10, 2011, Dr. Huss completed a Physical RFC Assessment wherein he opined that plaintiff could not use either or both of his feet for repetitive movements because of severe diabetic neuropathy.  Dr. Huss further opined that plaintiff could not be exposed to unprotected heights and could not be exposed to marked temperature change due to diabetic neuropathy.  Dr. Huss opined that plaintiff could frequently be around moving machinery but could only occasionally drive automotive equipment and occasionally be exposed to dust, fumes, gases, and noise.  Dr. Huss described plaintiff's pain as moderate and reported that prolonged sitting and standing aggravated plaintiff's pain.  Dr. Huss further reported that getting up and moving around helped to relieve plaintiff's pain.  Dr. Huss opined that plaintiff should not work inasmuch as plaintiff's diabetic neuropathy limited his ability to use his feet and to tolerate pain.  (Tr. 452-55.)

In an RFC Questionnaire completed January 10, 2011, Dr. Huss reported that plaintiff suffered from diabetes mellitus, diabetic neuropathy and sleep apnea, and that plaintiff's symptoms of the conditions included fatigue, difficulty walking, episodic vision blurriness, muscle weakness, pain and numbness in the extremities, loss of manual dexterity, hyper/hypoglycemic attacks, and numbness in the feet.  Dr. Huss noted the clinical findings to

show loss of sensation in the feet. Dr. Huss opined that plaintiff's pain would frequently interfere with plaintiff's attention and concentration during a workday. Dr. Huss opined that plaintiff could tolerate moderate work stress. Dr. Huss opined that plaintiff could walk four city blocks without rest or severe pain; could sit for thirty minutes at a time before needing to get up; could stand for fifteen minutes before needing to sit down or walk; could sit for two hours total and stand/walk for two hours total in an eight-hour workday. Dr. Huss opined that plaintiff would need to walk every thirty minutes for five minutes at a time during an eight-hour workday. Dr. Huss opined that plaintiff needed a job with a sit/stand option at will. Dr. Huss also opined that plaintiff would need to take unscheduled breaks every hour during an eight-hour workday. Dr. Huss reported that plaintiff did not need an assistive device for walking. Dr. Huss opined that plaintiff could occasionally lift and carry up to twenty pounds and could frequently lift and carry less than ten pounds. Dr. Huss opined that plaintiff could frequently climb stairs; could rarely twist, stoop, bend, crouch, or squat; and could never climb ladders. Dr. Huss also opined that plaintiff had significant limitations in his ability to reach, handle or finger. Dr. Huss opined that plaintiff should avoid moderate exposure to extreme cold and chemicals, and should avoid concentrated exposure to cigarette smoke, perfumes, solvents/cleaners, fumes/odors, and

dust.  Dr. Huss estimated that plaintiff would be absent from work about two days per month on account of his impairments.  Dr. Huss opined that plaintiff experienced these symptoms and limitations since 2007.  (Tr. 456-60.)

On February 4, 2011, plaintiff visited ophthalmologist Dr. Todd Theobald and reported having blurred vision.  Upon examination, plaintiff was diagnosed with ocular histoplasmosis—not visually significant, and retinal vascular changes, neither of which was related to plaintiff's diabetes condition.  Educational materials were given regarding eye complications of diabetes.  (Tr. 461-66.)

Plaintiff visited Dr. Huss in March and June 2011 for follow up on diabetes.  Medications were refilled and instructions were given regarding diabetes management.  (Tr. 472-77.)

## IV.  Additional Medical Evidence Before the Appeals Council

On September 22, 2011, Dr. Huss noted that plaintiff's blood sugar readings had been high recently and that plaintiff's diabetes was poorly controlled.  Plaintiff admitted to a poor diet.  Insulin lispro was added to plaintiff's medication regimen.  (Tr. 486-89.)

On November 21, 2011, plaintiff visited Dr. Huss who noted plaintiff's diabetes control to be dramatically better since adding insulin lispro at mealtime.  Dr. Huss noted neuropathy to continue to be a problem in the feet and legs.  Plaintiff reported

having no side effects from his medications. Physical examination of the extremities showed decreased sensation but normal pulses, good capillary refill, and no pedal edema. Plaintiff was instructed to continue with his current medications. (Tr. 490-95.)

Plaintiff returned to Dr. Huss on March 1, 2012, and reported that he may be losing his Medicaid. Dr. Huss noted plaintiff's neuropathy of the feet to limit him due to pain and numbness, worsening with standing or walking. Dr. Huss noted that plaintiff could not perform his previous work as a truck driver or in power line construction. Dr. Huss noted plaintiff to be compliant with his diet and medication. Physical examination was unremarkable. Plaintiff was instructed to continue with his current treatment and medications. (Tr. 499-501.)

In a letter dated March 1, 2012, and addressed to "To whom it may concern," Dr. Huss wrote,

> I have determined he is unable to work in any type of gainful employment that he has done in the past based on his diagnosis of severe diabetic neuropathy. It has been determined that this will continue lifelong. He has been able to bring his diabetes under improved control due to medical coverage from Medicaid, but his losing medical coverage will likely result in his inability to afford medical care and medications. This will result in significantly degraded life expectancy and quality of life for Mr. Nash.

(Tr. 483.)

## V. The ALJ's Decision

The ALJ determined that plaintiff met the insured status requirements of the Social Security Act through December 31, 2013. The ALJ found that plaintiff had not engaged in substantial gainful activity since November 24, 2008, the alleged onset date of disability. The ALJ determined plaintiff's diabetes with peripheral neuropathy, sleep apnea, obesity, and adjustment disorder to constitute severe impairments, but that such impairments, either singly or in combination, did not meet or medically equal any listed impairment in 20 C.F.R, Part 404, Subpart P, App. 1. (Tr. 19-25.) The ALJ determined plaintiff to have the RFC to perform light work

> except for a sit and stand option at will. He can perform work that involves no heights or climbing, no moving or dangerous machinery, and no foot control. He must work indoors in a clean air environment. He has no limitation in his ability to understand, remember, and carry out simple instructions and make judgments on simple work-related decisions; and moderate limitation in his ability to understand, remember, and carry out complex instructions and make judgments on complex work-related decisions. He has no limitation in his ability to interact appropriately with the public, supervisors, and coworkers. He has mild limitation in his ability to respond appropriately to usual work situations and changes in routine work setting.

(Tr. 26.)

The ALJ determined that plaintiff could not perform his past

relevant work. Considering plaintiff's age, education, work experience, and RFC, the ALJ determined vocational expert testimony to support a finding that plaintiff could perform other work as it exists in significant numbers in the national economy, and specifically security guard, hand packager and cashier. The ALJ thus determined that plaintiff was not under a disability since the alleged onset date through the date of the decision. (Tr. 27-32.)

## VI. Discussion

To be eligible for Social Security Disability Insurance Benefits under the Social Security Act, plaintiff must prove that he is disabled. <u>Pearsall v. Massanari</u>, 274 F.3d 1211, 1217 (8th Cir. 2001); <u>Baker v. Secretary of Health & Human Servs.</u>, 955 F.2d 552, 555 (8th Cir. 1992). The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A). An individual will be declared disabled "only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy." 42 U.S.C. § 423(d)(2)(A).

To determine whether a claimant is disabled, the Commissioner engages in a five-step evaluation process. <u>See</u> 20 C.F.R. § 404.1520; <u>Bowen v. Yuckert</u>, 482 U.S. 137, 140-42 (1987). The Commissioner begins by deciding whether the claimant is engaged in substantial gainful activity. If the claimant is working, disability benefits are denied. Next, the Commissioner decides whether the claimant has a "severe" impairment or combination of impairments, meaning that which significantly limits his ability to do basic work activities. If the claimant's impairment(s) is not severe, then he is not disabled. The Commissioner then determines whether claimant's impairment(s) meets or equals one of the impairments listed in 20 C.F.R., Subpart P, Appendix 1. If claimant's impairment(s) is equivalent to one of the listed impairments, he is conclusively disabled. At the fourth step, the Commissioner establishes whether the claimant can perform his past relevant work. If so, the claimant is not disabled. Finally, the Commissioner evaluates various factors to determine whether the claimant is capable of performing any other work in the economy. If not, the claimant is declared disabled and becomes entitled to disability benefits.

The decision of the Commissioner must be affirmed if it is supported by substantial evidence on the record as a whole. 42 U.S.C. § 405(g); <u>Richardson v. Perales</u>, 402 U.S. 389, 401 (1971); <u>Estes v. Barnhart</u>, 275 F.3d 722, 724 (8th Cir. 2002). Substantial

evidence is less than a preponderance but enough that a reasonable person would find it adequate to support the conclusion.  <u>Johnson v. Apfel</u>, 240 F.3d 1145, 1147 (8th Cir. 2001).  This "substantial evidence test," however, is "more than a mere search of the record for evidence supporting the Commissioner's findings."  <u>Coleman v. Astrue</u>, 498 F.3d 767, 770 (8th Cir. 2007) (internal quotation marks and citation omitted).  "Substantial evidence on the record as a whole . . . requires a more scrutinizing analysis."  <u>Id.</u> (internal quotation marks and citations omitted).

To determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole, the Court must review the entire administrative record and consider:

1.    The credibility findings made by the ALJ.

2.    The plaintiff's vocational factors.

3.    The medical evidence from treating and consulting physicians.

4.    The plaintiff's subjective complaints relating to exertional and non-exertional activities and impairments.

5.    Any corroboration by third parties of the plaintiff's impairments.

6.    The testimony of vocational experts when required which is based upon a proper hypothetical question which sets forth the claimant's impairment.

<u>Stewart v. Secretary of Health & Human Servs.</u>, 957 F.2d 581, 585-86 (8th Cir. 1992) (quoting <u>Cruse v. Bowen</u>, 867 F.2d 1183, 1184-85 (8th Cir. 1989)).

The Court must also consider any evidence which fairly detracts from the Commissioner's decision. <u>Coleman</u>, 498 F.3d at 770; <u>Warburton v. Apfel</u>, 188 F.3d 1047, 1050 (8th Cir. 1999). However, even though two inconsistent conclusions may be drawn from the evidence, the Commissioner's findings may still be supported by substantial evidence on the record as a whole. <u>Pearsall</u>, 274 F.3d at 1217 (citing <u>Young v. Apfel</u>, 221 F.3d 1065, 1068 (8th Cir. 2000)). "[I]f there is substantial evidence on the record as a whole, we must affirm the administrative decision, even if the record could also have supported an opposite decision." <u>Weikert v. Sullivan</u>, 977 F.2d 1249, 1252 (8th Cir. 1992) (internal quotation marks and citation omitted); <u>see also</u> <u>Jones ex rel. Morris v. Barnhart</u>, 315 F.3d 974, 977 (8th Cir. 2003).

Because the ALJ committed no legal error and the decision is supported by substantial evidence on the record as a whole, the decision of the Commissioner finding plaintiff not to be disabled must be affirmed.

A.   <u>Combination of Impairments</u>

Plaintiff claims that the ALJ erred by failing to consider plaintiff's mental impairment to be a severe impairment and thus failed to consider plaintiff's impairments in combination in determining plaintiff not to be disabled. A reading of the ALJ's decision shows the plaintiff's claim to be without merit.

As noted above, the ALJ found plaintiff's adjustment

disorder to be a severe impairment.  (Tr. 21.)  Plaintiff's claim

otherwise is refuted by the record.  To the extent plaintiff claims

that the ALJ failed to consider his impairments in combination, the

record likewise refutes this contention.  A review of the ALJ's

decision shows the ALJ to have thoroughly summarized all of

plaintiff's medical records and to have discussed each of

plaintiff's alleged impairments, including plaintiff's severe

mental impairment of adjustment disorder.  The ALJ expressly found

that plaintiff did "not have an impairment or combination of

impairments that meets or medically equals the severity of one of

the listed impairments[.]"  (Tr. 23.)  In addition, the ALJ

continued to refer to the combination of plaintiff's impairments

throughout the remainder of his decision.

        In view of the ALJ's summary of the medical records and

his finding based thereon that the combination of plaintiff's

impairments did not render him disabled, the undersigned finds that

the ALJ properly considered the combined effects of plaintiff's

impairments, including plaintiff's mental impairment, and

plaintiff's contention otherwise should be denied.  <u>Martise v.</u>

<u>Astrue</u>, 641 F.3d 909, 924 (8th Cir. 2011).

B.    <u>RFC and Credibility Determination</u>

        Plaintiff claims that the ALJ erred in his RFC

determination by failing to consider the entirety of the record and

by discounting plaintiff's subjective complaints based on

plaintiff's daily activities.

When determining a claimant's RFC, the ALJ must first evaluate the credibility of the claimant's subjective complaints. Nishke v. Astrue, 878 F. Supp. 2d 958, 978 (E.D. Mo. 2012). When undergoing such evaluation, the ALJ must consider all evidence relating to the complaints, including the claimant's prior work record and third party observations as to the claimant's daily activities; the duration, frequency and intensity of the symptoms; any precipitating and aggravating factors; the dosage, effectiveness and side effects of medication; and any functional restrictions. Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984) (subsequent history omitted). Although the ALJ may not discount subjective complaints on the sole basis of personal observation, he may disbelieve a claimant's complaints if there are inconsistencies in the evidence as a whole. Id. The "crucial question" is not whether the claimant experiences symptoms, but whether his credible complaints prevent him from performing work. Gregg v. Barnhart, 354 F.3d 710, 713-14 (8th Cir. 2003).

Where a claimant challenges an ALJ's adverse credibility determination, "the duty of the court is to ascertain whether the ALJ considered all of the evidence relevant to the plaintiff's complaints . . . under the Polaski standards and whether the evidence so contradicts the plaintiff's subjective complaints that the ALJ could discount his or her testimony as not credible."

<u>Masterson v. Barnhart</u>, 363 F.3d 731, 738-39 (8th Cir. 2004).  It is not enough that the record merely contain inconsistencies. Instead, the ALJ must specifically demonstrate in his decision that he considered all of the evidence.  <u>Id.</u> at 738; <u>see also</u> <u>Cline v. Sullivan</u>, 939 F.2d 560, 565 (8th Cir. 1991).  Where an ALJ explicitly considers the <u>Polaski</u> factors but then discredits a claimant's complaints for good reason, the decision should be upheld.  <u>Hogan v. Apfel</u>, 239 F.3d 958, 962 (8th Cir. 2001); <u>see also</u> <u>Casey v. Astrue</u>, 503 F.3d 687, 696 (8th Cir. 2007).  The determination of a claimant's credibility is for the Commissioner, and not the Court, to make.  <u>Tellez v. Barnhart</u>, 403 F.3d 953, 957 (8th Cir. 2005); <u>Pearsall</u>, 274 F.3d at 1218.

As an initial matter, the ALJ did not err in considering plaintiff's daily activities in determining plaintiff's credibility, and indeed was required to do so under <u>Polaski</u>.  In addition, a review of the ALJ's decision *in toto* shows the ALJ to have considered all of the <u>Polaski</u> factors in determining plaintiff's credibility and to have set out numerous inconsistencies in the record to support his conclusion that plaintiff's subjective complaints were not credible.  In addition to finding plaintiff's daily activities of camping trips, exercising, cleaning house, shopping, mowing the lawn, and visiting

family to be inconsistent with disabling pain,[2] the ALJ also noted that plaintiff received only conservative treatment for his impairments, which was inconsistent with a finding of disability. See Moore v. Astrue, 572 F.3d 520, 525 (8th Cir. 2009) (conservative treatment during period of alleged disability inconsistent with complaints of disabling pain). In addition, the ALJ noted that plaintiff was not consistently compliant with his medication and diet regimen, see Wildman v. Astrue, 596 F.3d 959, 968 (8th Cir. 2010) (noncompliance with doctor's instruction as to diet and medication constitutes a valid reason to discredit subjective complaints); but that his diabetes was under control when he was compliant, see Brown v. Barnhart, 390 F.3d 535, 540 (8th Cir. 2004) (impairment cannot be considered disabling if it can be controlled by treatment or medication). The ALJ also noted that plaintiff did not report any adverse side effects to his physicians, and indeed Dr. Huss's notes show plaintiff not to experience any side effects. Finally, the ALJ noted that Dr. Huss's opinion that plaintiff suffered disabling symptoms since 2007 was inconsistent with plaintiff's ability to work until January 2009. See Goff v. Barnhart, 421 F.3d 785, 792-93 (8th Cir. 2005) (working with alleged disabling symptoms diminishes

_____

[2]See Medhaug v. Astrue, 578 F.3d 805 (8th Cir. 2009) (claimant's ability to do all of his own chores and to mow lawn inconsistent with complaints of disabling pain); Pelkey v. Barnhart, 433 F.3d 575 (8th Cir. 2006) (daily activities of household chores, shopping, mowing lawn, and occasionally visiting friends inconsistent with complaints of disabling pain).

credibility). These reasons for discrediting plaintiff's subjective complaints are supported by substantial evidence on the record as a whole.

A review of the ALJ's decision shows that, in a manner consistent with and as required by <u>Polaski</u>, the ALJ thoroughly considered plaintiff's subjective complaints on the basis of the entire record and set out numerous inconsistencies that detracted from plaintiff's credibility. Because the ALJ's determination not to credit plaintiff's subjective complaints is supported by good reasons and substantial evidence, this Court must defer to the ALJ's credibility determination. <u>Goff</u>, 421 F.3d at 793; <u>Vester v. Barnhart</u>, 416 F.3d 886, 889 (8th Cir. 2005); <u>Gulliams v. Barnhart</u>, 393 F.3d 798, 801 (8th Cir. 2005).

In addition, contrary to plaintiff's assertion, a review of the ALJ's decision shows him to have thoroughly summarized and analyzed the entirety of the medical and non-medical evidence before him, the consistency of such evidence when viewed in light of the record as a whole, and to have assessed plaintiff's RFC based on such evidence in the case record. Because some medical evidence supports the ALJ's RFC determination, the ALJ's RFC assessment must stand. <u>See</u> <u>Steed v. Astrue</u>, 524 F.3d 872, 876 (8th Cir. 2008).

C. <u>Commissioner's Burden at Step 5</u>

In a cursory manner, plaintiff claims that the ALJ failed

to meet the Commissioner's burden at Step 5 of the sequential analysis by failing to demonstrate that specific jobs exist that plaintiff could perform with an RFC that limits him to jobs that permit him to alternate between sitting and standing and account for his mental limitations. A review of the record refutes this claim.

Once a claimant carries his burden through Step 4 of the analysis and demonstrates that he cannot perform his past relevant work, the burden shifts to the Commissioner to demonstrate that the claimant has the RFC to perform a significant number of jobs within the national economy. <u>Pearsall</u>, 274 F.3d at 1219. The Commissioner may satisfy this burden in one of two ways: 1) through use of the Medical-Vocational Guidelines if the claimant's impairments are exertional in nature; or 2) through the testimony of a vocational expert if the claimant has non-exertional impairments, such as pain or mental limitations. <u>Id.</u>

Here, the ALJ satisfied the Commissioner's burden at Step 5 by soliciting the testimony of a vocational expert. Plaintiff makes no specific challenge to the testimony of the vocational expert or to the hypothetical posed by the ALJ. Instead, plaintiff argues in a cursory manner that the ALJ failed to demonstrate that jobs exist for a person with plaintiff's mental limitations and sit/stand requirement. A review of the ALJ's RFC determination, however, shows the ALJ to have included the sit/stand option and to

have accounted for plaintiff's mental limitations to the extent he found them credible and supported by substantial evidence on the record as a whole. Because the hypothetical question posed to the vocational expert contained these limitations, it cannot be said that the ALJ erred by relying on vocational expert testimony in finding plaintiff able to perform other work in the national economy. <u>Pearsall</u>, 274 F.3d at 1220.

## VI. Conclusion

On the claims raised by plaintiff on this appeal for judicial review, substantial evidence on the record as a whole supports the ALJ's decision. Therefore, the Commissioner's determination that plaintiff was not under a disability must be affirmed.

Accordingly, for all of the foregoing reasons,

**IT IS HEREBY ORDERED** that the decision of the Commissioner is affirmed and plaintiff's Complaint is dismissed with prejudice.

Judgment shall be entered accordingly.

_Frederick R. Buckles_
UNITED STATES MAGISTRATE JUDGE

Dated this __23rd__ day of September, 2013.